**25-MJ-3038-JDH**

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION<br>FOR A CRIMINAL COMPLAINT</u>

I, Jason D. Costello, being duly sworn, state as follows:

### INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since July 2004.   I am assigned to the FBI's Boston Field Office.  Since November 2020, I have served in the role of Airport Liaison Agent Coordinator at Boston Logan International Airport where I investigate violations of federal law in the airport environment and onboard aircraft.  In my capacity as an Airport Liaison Agent, I work with other law enforcement agencies at Boston Logan International Airport, including the Massachusetts State Police (MSP). I have received training in the investigation of sexual assault and related crimes from both the United States Department of Justice and Municipal Police Training Committee in the Commonwealth of Massachusetts.

2.      I make this affidavit in support of a criminal complaint charging Jonathan Alan LEFMAN ("LEFMAN"), YOB 1978, with violating Title 49, United States Code, Section 45606(1) (application of certain criminal laws to acts on aircraft) and Title 18 United States Code, Section 2244(b) (abusive sexual contact).

3.      The information in this affidavit is based upon my training and experience, my personal knowledge of this investigation, and information provided to me by law enforcement officers who have assisted in this investigation and have experience investigating criminal matters.  In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts which I believe are sufficient to establish the requisite probable cause.

**RELEVANT STATUTES**

4. I am aware that, under Title 49, United States Code, Section 46501(2)(A), Special Aircraft Jurisdiction of the United States applies to any civil aircraft of the United States while the aircraft is in flight. An "aircraft in flight" is defined in Section 46501(1)(A) of that title, as relevant here, as "an aircraft from the moment all external doors are closed following boarding through the moment when one external door is opened to allow passengers to leave the aircraft."

5. Title 49, United States Code, Section 46506(1) states, in pertinent part, "[a]n individual on an aircraft in the special aircraft jurisdiction of the United States who commits an act that … if committed in the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18) would violate … chapter 109A of title 18, shall be fined under title 18, imprisoned under that section or chapter, or both."

6. I am also aware that Title 18, United States Code, Chapter 109A, Section 2244(b), provides that whoever "knowingly engages in sexual contact with another person without that other person's permission shall be fined under this title, imprisoned not more than two years, or both." "Sexual Contact" is defined in section 2246(3) of that title, as relevant here, as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh or buttocks of any person with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person."

**PROBABLE CAUSE**

7. The facts gathered to date in the investigation and described in this affidavit demonstrate probable cause that on August 30, 2024, while a passenger aboard JetBlue flight 62 ("JBU62") and flying from San Juan, Puerto Rico to Boston, Massachusetts, LEFMAN engaged in abusive sexual contact against another person. Specifically LEFMAN, on multiple occasions

2

during the flight and while on the ground waiting to deplane in Boston, intentionally worked his hand in between and through the area between the back and bottom of the seat directly in front of him, where a seventeen-year-old female passenger ("Minor A")[1] was seated, and touched her buttocks without her permission, thereby engaging in abusive sexual contact.

8.    According to JetBlue records, JBU62 was a civilian commercial flight, operated from Luis Muñoz Marín International Airport, San Juan, Puerto Rico ("SJU") to Boston Logan International Airport, Boston, Massachusetts ("BOS") on August 30, 2024.  The aircraft used for JBU62 was an Airbus A321 Classic, registered in the United States by the Federal Aviation Administration (FAA), registration number "N948JB."[2]   On the aircraft, there are generally three seats on each side of a central aisle, identified by their respective row number and seat letter.  Seats are lettered "A" through "F", with "A" being the window seat on the left side of the aircraft and "F" being the window seat on the right side of the aircraft, when facing forward.

9.    According to www.flightaware.com, JBU62 departed SJU gate A1 at approximately 9:59 AM Atlantic Standard Time (AST) and arrived at BOS gate C25 at approximately 2:07 PM Eastern Daylight Time (EDT), for a travel time of just over four hours.[3]

10.    According to JetBlue, LEFMAN travelled on JBU62 with his wife and four minor

---

[1] Minor A's identity is known to the government but redacted pursuant to 18 U.S.C. § 3509.

[2] JBU62 / N948JB meets the definition of a civil aircraft of the United States provided in 49 U.S.C. § 40102(a)(17).

[3] Puerto Rico observes Atlantic Standard Time all year. AST is four hours behind Coordinated Universal Time (UTC); it is the same time as Eastern Daylight Time, which was in effect on August 30, 2024.

children.[4]   The family was assigned to seats 31A through 31F, which was the entirety of row 31. LEFMAN was assigned to seat 31A, his wife to 31B, his 16-year-old son and oldest child to 31C, and his three daughters, from oldest to youngest, to seats 31D, 31E and 31F, respectively. However, the family members did not all sit in their assigned seats.  As will be described in subsequent paragraphs, LEFMAN actually sat in seat 31F, the window seat on the far right of row 31.  LEFMAN's son sat to the left of LEFMAN, in seat 31E.

11.    According to JetBlue, Minor A travelled on JBU62 with five extended family members, including an adult female family member ("Witness 1") and Witness 1's two minor children, as well as a second adult female family member and her teenage son.   Minor A was assigned to seat 33F.  Witness 1 and her two children were assigned to seats 33E, 33D and 30F respectively.  Subsequent investigation revealed that Minor A actually sat in seat 30F on JBU62, apart from the family group, so that Witness 1 and her two minor children could sit together in seats 33D through 33F.

12.    Seat 30F, in which Minor A sat, is the right window seat directly in front of seat 31F, in which LEFMAN sat.

13.    Following the arrival and passenger deplaning of JBU62 at BOS on August 30, 2024, Witness 1 reported to a JetBlue supervisor working at gate C25 ("Witness 2"), in sum and substance, that the man seated behind Minor A on JBU62 (*i.e.*, LEFMAN) had inappropriately touched Minor A during the flight.  Witness 1 showed Witness 2 a video to support her statement. The video, taken by Minor A on board the airplane, showed a man's fingers protruding between the back and bottom of Minor A's seat into the area of Minor A's seat bottom and moving around.

---

[4] The identities of LEFMAN's family member and all other civilian witnesses referenced herein are known to the government but redacted for their privacy.

4

Witness 1 informed Witness 2 that the man and his family had already left the gate area. The MSP were contacted.

14.    Witness 1 told MSP that upon deplaning and while still on the jet bridge, Minor A told Witness 1 how the man had touched Minor A inappropriately during the flight and while on the ground at BOS and showed Witness 1 videos that Minor A had taken. The first video was of the man's hand protruding through the seat. The second video showed the man on the jet bridge with his wife, son, and daughters. Upon seeing the second video, Witness 1 remembered the man from the plane as she had seen him get Minor A's carry-on bag down out of the overhead bin for her as they deplaned. Witness 1, upon seeing the man outside the terminal prior to meeting with MSP, had confronted the man and his wife. Witness 1 accused the man of touching Minor A and showed them the video of the hand. According to Witness 1, the man claimed he had been stretching and apologized. Witness 1 also told the man's wife that she should be concerned about the man's behavior as she has children.

15.    Witness 2 told MSP that LEFMAN and his family were seated in the entirety of row 31, behind Minor A. As LEFMAN was the only adult male assigned to row 31, a tentative determination was made that the man who touched Minor A was LEFMAN; as described below, this determination was later supported by descriptions given by Minor A of the appearance of the individual who poked his fingers through her seat and his clothing, video footage of LEFMAN matching that description, and admissions by LEFMAN that he was seated directly behind Minor A, among other support. Witness 2 provided MSP with the date of birth and contact telephone number of LEFMAN.

**Minor A**

16.    Minor A was interviewed by MSP on August 30, 2024, and told them the following:

5

a.      Minor A is 17 years old.  About an hour before JBU62 landed at BOS, Minor A felt someone or something touch her while she was in her seat.  This happened multiple times while JBU62 was in the air.  Asked where the person had touched her, Minor A appeared shy and embarrassed, and pointed with her finger and made a sweeping motion left and right across her buttocks.  The MSP investigator asked Minor A if she meant that she had been touched on her "bum," a common slang term for buttocks, and Minor A responded affirmatively.

b.      Once JBU62 landed at BOS, while still seated and waiting to get off the aircraft, Minor A felt someone or something touch her buttocks again.  As she had anticipated this, Minor A had her phone handy.  Minor A immediately slid forward in her seat, turned slightly to her right, and starting to record a video with her phone of the area in her seat where her buttocks had been.  It was then that Minor A saw a man's fingers come through and into her seat, between seat back and seat bottom.  Minor A told the MSP investigator that the fingers belonged to the man seated directly behind her (LEFMAN).  Minor A also indicated that the man had touched the backs of her feet with his feet, under the seat.  Minor A sent the video that she took to the MSP investigator.

c.      I have reviewed the video provided by Minor A.  In the video, fingers appearing from their color, size, and shape to belong to a Caucasian male, worked their way in between the seat back and seat bottom of an aircraft seat, into Minor A's seat where her buttocks would have been if seated normally.  The fingers appeared to come from under and behind Minor A's seat.  Based on the orientation of the fingers and thumb, it appears the fingers belonged to the man's right hand.  The fingers appeared to search around the area vacated by Minor A's buttocks for approximately seven or eight seconds before

6

ultimately retreating out of Minor A's seat.  The exposed right knee of the individual seated behind Minor A, that is close to and/or in contact with both the back of Minor A's right armrest and the outer wall of the aircraft, appears from color, size, and shape to be that of a Caucasian male, consistent with a male wearing shorts.  Minor A's right hip can be seen in the video, not far from the protruding fingers.  A selection of still images from the video, with approximate elapsed times, are included below:



d.      After Minor A exited the aircraft, and while still on the jet bridge, she took a video of the man who had been seated behind her and who she believed had touched her as he got off the aircraft with his family and walked past her.  Minor A sent a screen capture from that video to the MSP investigator.  I have reviewed that screen capture.

17.     I recognize the Caucasian male in the screen capture, who is wearing eyeglasses

7

and a dark hat, as LEFMAN.  My recognition of LEFMAN is based on my review of both his Massachusetts driver's license photograph and, as will be described in subsequent paragraphs, his video-recorded interview with MSP and FBI investigators on August 30, 2024, in which he positively identified himself.  Additionally, in that interview, LEFMAN was still wearing the same clothing and eyeglasses seen in the screen capture.

18.    At the conclusion of MSP's preliminary investigation, the MSP investigator asked Minor A to write out a statement about what had happened and send it to him.  On September 4, 2024, Minor A electronically sent the MSP investigator a written statement[5] alleging that on the flight, "a men touched me without my permission."  She alleged that although "[a]t first I thought he was stretching because we all get tired," eventually she "started to realize that he was really touching me" and "kept moving forward and side to side" to avoid being touched.  She stated that, "when we arrived to Boston we was waiting to long enough for him to trying to touch me again and was when I really saw his hand (fingers) through the seat and I did a video of him."

19.    On September 9, 2024, Minor A was interviewed by FBI investigators in order to obtain additional details:

a.    Minor A physically demonstrated how she captured the video of the man's hand.  Specifically, Minor A, who was seated in a chair during the interview, slid forward so that her buttocks were on the front of the seat and no longer in contact with the chair back.  Minor A then twisted her upper body to the right so that she could observe her right hip and the rear of the seat and the chair back.  She indicated that this is when Minor A took the video of the man's hand.  Minor A could not see the man's face at that moment as

---

[5] English is not Minor A's native language, but she provided the statement in English.

he appeared to be leaning forward in his seat.

b.      Once the man could no longer touch Minor A's buttocks, Minor A felt the man's feet touch hers under the seat.  At that moment, Minor A could see that the man was leaning to his and Minor A's left and looking at Minor A through the gap between the seats. Minor A could see the man in the reflection of the television screen in the seatback in front of her.  Minor A could see the man's face, eyeglasses, and hat.  Minor A was aware that a "boy," maybe the man's son, sat in the middle seat next to the man.  The boy (LEFMAN's 16-year-old son) wore a white or off-white colored hat.  When they were about to get off the plane, the man helped Minor A by getting her bag down from the overhead bin.

c.      Minor A showed investigators the metadata associated with the two videos she had taken.  The first video, which was of the man's hand protruding into Minor A's seat, was recorded at 2:11 PM on August 30, 2024.  The geolocation of the video showed that it was taken at or near BOS.  The second video, which was of the man and his family getting off the aircraft onto a jet bridge, was recorded at 2:21 PM on August 30, 2024.  The geolocation of the video showed that it was taken at BOS.  Minor A provided investigators with the second video, as she had only sent a screen capture from the video to the MSP investigator previously.

d.      I have reviewed the second video taken by Minor A with her phone.  The video is taken on a jet bridge facing an open aircraft door in the background.  In the video, LEFMAN and his family deplane and walk past the person filming and camera (Minor A and her phone).  LEFMAN, when he first appears in the video, appears to briefly look directly at Minor A and/or her phone.  As LEFMAN walks past, he appears to avoid looking at Minor A and/or her phone.  In the video, LEFMAN appeared dressed as he did in the

9

screen capture, wearing a light short-sleeve shirt, dark hat, and glasses; the video does not depict his bottom half, although airport CCTV described below depicts him wearing shorts. LEFMAN's son, whom I recognize from his Massachusetts driver's license photograph, was wearing a white or light-colored hat, white long-sleeved shirt and dark blue or black long pants. LEFMAN's son was not wearing eyeglasses.

**BOS Closed Circuit Television**

20.    A review of BOS closed circuit television (CCTV) recordings showed that LEFMAN and his children exited the jet bridge into the C25 gate area at approximately 2:22 PM on August 30, 2024, which was shortly after Minor A recorded her second video. LEFMAN was observed to be wearing shorts. LEFMAN and his children proceeded immediately out of the gate area to a location further down the terminal walkway. There LEFMAN and his children waited for LEFMAN's wife, who exited the jet bridge about a minute later and joined them. LEFMAN and his family then departed the area and proceeded through the nearby exit to the public side of the terminal and down to the baggage claim area. When proceeding through the exit, LEFMAN appeared to look back and over his shoulder in the direction of the gate area, where Minor A and her family remained.

21.    Meanwhile, Minor A, Witness 1, and Witness 1's children exited the jet bridge into the C25 gate area about 20 seconds after LEFMAN's wife. There they joined the second adult female family member and her teenage son, who had deplaned earlier, having been seated further forward on the aircraft. Witness 1 then broke away from the group and made contact with Witness 2 and proceeded to speak with her.

22.    At approximately 2:36 PM, LEFMAN and his family walked outside of terminal C to the passenger pick up area where they waited for a ride. A minute or two later, Minor A and

her family members walked outside of terminal C to the passenger pick up area as well. Witness 1 and the second adult female family member's teenage son approached LEFMAN and his family. Witness 1 appeared to be speaking and showing LEFMAN and his wife something in her hand, likely her or Minor A's phone. LEFMAN and his wife appeared to look at what Witness 1 was showing them. As Witness 1 and the second adult female family member's teenage son walked away to rejoin the remaining family members including Minor A, LEFMAN turned to face in their direction and appeared to put his hands together in a praying gesture.

### Witness 2

23.    Witness 2, the JetBlue supervisor, was interviewed by FBI investigators on October 3, 2024.

24.    Witness 2 told investigators that she spoke directly to Minor A while waiting for the MSP to arrive. Witness 2 could see that Minor A was upset. Minor A told Witness 2 that she was seated in a window seat when she felt something touch her from behind. Minor A then slid forward away from the touching, turned in her seat and took the video of the hand. As Witness 2 told investigators this, she physically demonstrated it in the chair in which she was seated. Witness 2 pointed to her buttocks to show where Minor A had indicated to Witness 2 that she had been touched. Witness 2 also turned to her right, which would have been the window-side of Minor A's seat, when demonstrating how Minor A took the video. Investigators noted that the way that Witness 2 demonstrated this activity to them, which she did unsolicited, was the same as how Minor A had demonstrated it for investigators during her interview. Witness 2 confirmed that what she had demonstrated was, in fact, demonstrated for her by Minor A when they spoke that day.

11

**Interview of LEFMAN**

25.    Later on August 30, 2024, after being provided with Miranda warnings, LEFMAN agreed to be interviewed by FBI and MSP investigators with his attorney present.  The interview was video recorded.  I reviewed that recording.

26.    LEFMAN confirmed that he, his wife, and their children travelled from SJU to BOS on a JetBlue flight earlier in the day on August 30.  LEFMAN and his family were assigned to and sat in row 31, although they did not necessarily sit in their assigned seats in row 31 and LEFMAN did not know who was assigned where.  LEFMAN sat in the window seat on right side of aircraft (31F).  LEFMAN's son sat in middle seat next to him (31E) and one of his daughters sat on the aisle (31D).  LEFMAN's wife sat across the aisle on the left side of the aircraft with his two other daughters.  LEFMAN denied having consumed any alcohol that day.  He likewise denied having taken any medication or drugs.  LEFMAN listened to a podcast while on the flight.  He got up to use the bathroom once, about the time that the announcement was made for the flight's initial descent.  He did not recall dropping anything or reaching under his seat for anything during the flight.

27.    LEFMAN recalled that a "woman" with black hair was seated in front of him on the flight.  In regard to the "woman's" race, LEFMAN could only say that he did not think she was "white."[6]

28.    LEFMAN remembered being confronted outside the terminal while waiting to be picked up.  Two people came over to him, pointed at him and started yelling.  They showed him and his wife a video.  LEFMAN described the two people as a woman with lighter hair (believed

---

[6] This basic description is consistent with that of Minor A.

12

to be Witness 1) and a male with darker hair (who I believe to be the second adult female family member's teenage son).  In regard to their race, LEFMAN could only say that they were not "white."[7]  Witness 1, who was the more vocal of the two and seemed upset, said that there was a 17-year-old girl crying.  When asked what Witness 1 said specifically, LEFMAN replied, "I don't recall exactly what was said.  It was… I was just shocked at being confronted."  When asked what the video showed, LEFMAN replied, "A seat and ahh...  something.  It looked like a finger on a seat.  That was it."  When asked if the fingers looked familiar, LEFMAN replied, "Not really, no." When asked if Witness 1 was accusing LEFMAN of the fingers being his, LEFMAN replied, "Umm… I don't… I don't remember what she said to be honest with you.  It was just a blur." When asked again what Witness 1 said when showing LEFMAN and his wife the video, LEFMAN replied, "Yeah, she was like saying, you know, she said to my wife, you know, '*Watch out.*' You know, '*You have young kids also at home.*'  Something like, '*You have children.*'"  LEFMAN was asked if Witness 1 accused him of anything and he replied, "Yeah, I think she said, '*You know you touched… You touched her… You had your finger here…*' I don't, I don't remember exactly was said to be honest with you, yeah, it was just a blur."  When asked if Witness 1 was accusing him of having touched a 17-year-old, LEFMAN said, "I don't know if she said touched or what, I don't know, yeah, I was just in shock."  When asked if he stuck his fingers in between the seats at any point during the flight, LEFMAN replied, "No. Not that I can recall."  LEFMAN then denied having had any contact with Minor A when asked directly.  When asked if he told Witness 1 that he was stretching, LEFMAN told investigators that he could not remember saying anything.

---

[7] This basic description is consistent with that of Witness 1 and the second adult female family member's teenage son.

29.  When shown the video of the fingers,[8] and asked directly, "So those hands and those fingers that we saw… what are you telling ... those are not your fingers?" he responded, "I. . .  I don't know.  I don't know."

### Investigation on N948JB

30.  On September 20, 2024, JetBlue allowed FBI investigators to conduct a search of N948JB, which was the aircraft used for JBU62 on August 30, 2024.  Investigators determined that an individual seated in 31F (LEFMAN's seat), the right window seat of row 31, could reach their hand in between the seat cushion and seat back of 30F (Minor A's seat) and touch the buttocks of an individual seated in 30F (MINOR A's seat), the right window seat of row 30.  This action could be accomplished by reaching one's hand, at an upward angle, behind the seat back pocket and then by pushing the hand through the area where the seat cushion and seat back touch.  As the seat back pocket is somewhat stiff, and individual would have to use their wrist and/or forearm to raise it upward somewhat.  It was noted that there is a flap attached to the front bottom of the seat back that when properly installed lays on the seat base and under the seat cushion.  The flap is attached to the seat base by a strip of Velcro.  Investigators defeated the flap by gently pulling on it and sweeping it out of the way with the fingers of the hand that was reaching up under the seat back pocket.

---

[8] In the interview, LEFMAN stated that he is left-handed.  The fingers in the video appeared to be fingers on the perpetrator's right hand.

14

**CONCLUSION**

31.    Based on the foregoing, I submit that there is probable cause to believe that on August 30, 2024, Jonathan Alan LEFMAN, being an individual in the special aircraft jurisdiction of the United States while onboard JetBlue flight 62 flying from San Juan, Puerto Rico to Boston, Massachusetts, did knowingly engage in unwanted sexual contact with "Minor A" by intentionally touching, through the clothing, the buttocks of Minor A with intent to abuse, humiliate, harass, degrade Minor A or arouse or gratify his own sexual desire in violation of Title 49, United States Code, Section 46506(1), application of certain criminal laws to acts on aircraft, and Title 18 United States Code, Section 2244(b), abusive sexual contact.

Jason D. Costello (by JDIt)
Jason D. Costello
Special Agent, FBI


Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this on this 6th day of February 2025.

HON. JESSICA D. HEDGES
United States Magistrate Judge